Good morning, counsel. Our first case this morning is Prose v. Molina Healthcare and I see Mr. Singh and Mr. Zhang. Can you hear me? Yes. All right, then let's proceed. Mr. Singh. Thank you, Chief Judge Sykes, and may it please the court. This is a False Claims Act case at the pleading stage. We allege that the government provided uncoordinated care services to folks in skilled nursing facilities who have acute chronic conditions and need extra care. They promised to provide those services and in exchange they received more money in the form of capitation payments from the state. Then they stopped providing those services, didn't tell the government, and kept all the money. That is textbook overcharging, the archetypal False Claims Act case. When this kind of overcharging is done knowingly, it results in liability under the statute. We also allege that the defendants concealed their inability to provide the SNFIS services when they sought renewal of their contracts for 2016 and 17, falsely promising to provide the services that they had no ability to Not just a breach of contract case, as the defendants have made it out to be, the breach of contract is egregious in this case, but it is accompanied by failure to disclose and concealment of the breach, and is accompanied by claims for payment for the full contract amount. And that's what makes this really a False Claims Act case, and quite a simple one at that. You can see it, as we've said in our briefs, as a case of factual falsity, where the government is being charged for services that were not provided, that is at least from the time that they stopped providing the SNFIS services going forward. You can see it as a case of legal falsity, but either way you cut it. You can't do this. The statute makes it unlawful and imposes liability. So Mr. Singh, I just wanted to get one fact clear in my own mind. You mentioned at one point that the capitation rates are quite different depending on the population, so that people get, as I recall, in excess of $2,000 for people in skilled nursing facilities, and the community rate, as I recall, was under $100. I don't remember the exact numbers, but I wondered how, in this situation, how many different populations were represented if the record shows that, and if the capitation rates really were so dramatically different. Yes, Your Honor. It is in the record. It's not in the appendix, unfortunately, but it is in the record. I believe that there are four or five different rate cells, the community one being the lowest-priced one and the nursing facilities one being the highest-priced one, and so there are four or five, and so there are differences. The other ones are called, I think, CBS Waiver Plus, and they're spelled out in the contract and in the Milliman report that does the math, but the difference is, if you're thinking about which is the right comparator to figure out how much higher the rates were, I think we do have the right comparison. If you're in the nursing facility, that's when you're likely to get the skilled nursing, the SNFIS services. If you're in the community, you're not going to get those services. There may be other reasons to add. These rate cells are stratified by age as well as geography. There's a central Illinois cell and a greater Illinois cell, and for age groups, and we've tried to draw comparisons to the most analogous ones in the complaint. You'll find those calculations, I believe, at paragraphs 53 to 55 of the complaint. That's where we have the Milliman report. If you're looking at the SNFIS services, that's where you're likely to get the most. But I think the only point that really matters for present purposes is one that's effectively not disputed, which is that the amount paid is higher if you provide SNFIS services than if you don't. The only reason I'm asking is because, again, as you've conceded, simple contract breaches are not the stuff of a False Claims Act case. There are more requirements, and if the rates are different by a couple of orders of magnitude, that would be apparent to anybody in the business. If the rates were just different by $10 or $15, then that could slip by somebody, even if it was a breach of contract, to charge a different rate. So I was just thinking of how obvious it was that something amiss was going on. I think it would have been quite obvious to a provider in Molina's position that this was an important part of the contract. I think the question really goes to, so I'll just point out a couple of things. First, that sort of see into a question, did they know, is the type of thing that we've certainly alleged it, and it's the type of thing that can be alleged. Generally, we're at the pleading stage. If they want to say, we didn't know, we had no on our rates, we thought that we were providing all the services we were supposed to provide. Those are facts that they can introduce into the record at the appropriate time, and we can talk about them at the appropriate time. But the allegation and the complaint, quite plainly, is that they knew they were obligated to provide these services. They stopped providing these services, and they knew, they would have known that this is important to the rates. These are expensive services, because what you have is you have... Mr. Singh, can I ask you to be a little more specific, at least to the extent you can, consistent with the record, about important and substantial and expensive? We know that the SNF capitation rates are much higher, much, much higher. But how big a role do the... I'm not ready to introduce the new acronym to our jurisprudence quite yet, but the skilled nursing facility specialist rates, do we have some indication of how big a factor those were in the capitation rates for the SNF populations? That's a good question, Your Honor. I think the only way to really know it would be to look at an actuarial report that doesn't include the services and try to compare it. That information is not in the record. And so... Do we know how much, for example, the defendant was supposed to pay Dr. Prose's company as compared to total receipts for the defense? Yes, Your Honor. We do know some of that. So there was a fee-for-service structure set up in the contract that the defendant had with Dr. Prose's company. I don't want to get this wrong. I don't have it in front of me. I believe it was about $128 per visit normally, but there were other factors as well that could influence the payment amounts. This would be spelled out in Exhibit 12 to the first amended complaint. It's not in the appendix on appeal, but it is in the record, and it spells out how many of those visits would be expected per patient month. So that is a question I do not know the answer to offhand, Your Honor. Sorry. As I understand it, though, the obligation was to provide sort of continuing, ongoing care. That is, to be on site, to be seeing the patients regularly and monitoring them. And so it's quite a hands-on form of care. In terms of the total patient population or per patient per month, I imagine it might vary a bit, but it's not just one, I wouldn't think. Well, if it's even two or three, it's going to be a sizable portion of the amount that the government is supposed to pay Molina for such patients. Could I ask you, Mr. Singh, to address one of the defense's arguments on materiality, which is that the government's renewals of their after Dr. Proza's allegations became known, show that this obviously was not material to the government? Yes, Your Honor. That line of argument comes from the Supreme Court's decision in the Universal Health Services versus Escobar case. And there, the Supreme Court said that if the government continues to make payments to a defendant, despite actual knowledge that certain requirements were violated, that is strong evidence that the requirements were not material. Here, there are a few reasons why the defendants can't rely on the contract renewals as a basis. First, there's nothing in the complaint suggesting actual knowledge of the violations. We have not conceded that point in the complaint anywhere. And in fact, we have alleged that the government didn't know that they had stopped providing the SNFIS services. And so the premise of the point is not here, is not met. Beyond that, even if you were to accept that it could be strong evidence against materiality, at the pleading stage, when there are also facts going in the other direction, including that these services are part of the essence of the bargain that Molina struck with the government, including that a reasonable payer would want these services to be provided, and just hearkening to the definition of materiality in the statute, a matter is material if it has a natural tendency to influence or is capable of influencing the payment or receipt of money or property by the defendant. Here, our allegation is that this caused them to get more money. That is clearly material. And price impact has almost always been understood to be this fact into the mix, that the government removed the contracts. I think what they have to do is they have to show through discovery that the government had actual knowledge, and then they have to show why this fact is more important in the calculus than all of the facts that go the other way. But for now, at the pleading stage, what you have is you have our allegations, and you don't have the premise of their point. It may be that you were planning to get to this anyway, but at least as I understand it, you're trying to fit into what I will loosely call our Rolls-Royce and Acacia cases in terms of you haven't attached, for example, specific documents that you're saying were fraudulent. You're relying on the payment system. And as I understand it, you're trying to kind of get us to adapt Escobar to the capitation payment system. The question I have is, do we have examples of the enrollment forms and what they tell the government about the so-called rate cells that seem to be at the core of this case? So the way that this process works is it actually involves relatively little input from the defendant. What will happen is the state will establish who is eligible, and we'll send what's called an 834 file, which is a list of the patients and the rate cells that are going to be paid out. So the state benefits against the rate cell? That's correct. And that's based on where the population is, the population characteristics of the beneficiaries. Then later, there's what's called an 820 file, which is the actual payment file that's sent over to the defendant. And what the defendant does is it performs a reconciliation where they examine their own records, and they say, OK, this patient is actually not enrolled with us. Oh, you missed a few who are coming to us for care. Or these ones are in the wrong rate cell. But in the process, the defendant is confirming the applicable rate cells. And we think that by doing that, they're doing just as much as the defendant in certain services. They're implying that the patients who are in those rate cells or the patients who are properly enrolled there are getting the services or at least able to get the services that were promised in the contract. And that's really not happening here. Moreover, I would just add that there are a bunch of reporting requirements that are called out in the complaint. This includes encounter data reports. It includes other regular reports that have to be for example, there is a change to the provider network. You have to tell the government promptly. And our allegation in the complaint is that no such reports were ever submitted in connection with the termination of the SNFIS program. And so it's not just in the claims for payment that you find the falsity. It's also in these other disclosure obligations that are designed to make sure that the in numerous places here. And I think what that adds up to, Your Honor, and just to be clear, lots of cases now have held that you can have FCA cases based on fraud in the capitation payment system. This is not a terribly novel adaptation of this court's existing precedents or the statute. And indeed, it would be very odd if there was this whole section of the health care system that just didn't have the protection of the False Claims Act. So multi-billion dollar business, a huge part of how health care is being provided these days is through capitation payments. And so I don't think that the adaptation needs to be too strenuous. I think when you look at how these payment systems work, there's meant to be a lot of transparency from providers. And the allegation in this case is that there wasn't any of that here, that important services were just ceased without much comment. I would also just like to, I want to save a little bit of time for rebuttal, but I want to flag that we have this separate claim for fraudulence inducement, which is another well-established theory of FCA liability. And here, there were readiness reviews that were conducted in connection with the contract criminals in 2016 and 2017. And we allege that during those readiness reviews, it wasn't disclosed that the SNFist program was gone, but promises to provide SNFist services were made, even though, as their own chief operating officer has testified, up through April 2017, they didn't have any ability to provide those services. But at the time, excuse me, Mr. Singh, but at the time, what worried me about that claim was at the time of the contracting, even if they didn't have a good faith intent, how do we know that they didn't have a good faith intent to go out there and find somebody else to provide the service? It's a pretty high standard under 9b to allege that kind of fraud. That's right, Your Honor. So under Rule 9b, what we want is we want some specificity. But what we're talking about here with state of mind, that can be pleaded generally. And so when you ask, they didn't have a good faith intent, what we're basing that on, we have done more than the normal pretrial investigation. We had an entire separate proceeding against them where we have deposition testimony from their insiders telling us that at the time, they had no SNFist program in place. They had talked internally about creating their own SNFist program. They hadn't gone to another provider. They've admitted that. And they never put it into action. And that was testimony taken in April 2017. So you know that at least before that date, they could not have said with a straight face, we're going to provide SNFist services when this contract starts. They had no mechanism to do it, none. And so if they said they were going to, that had to be false when they said it. At least at the pleading stage, I think we've alleged more than enough. If there are no other questions at this time, I'll reserve for a rebuttal. That's fine, thank you. Mr. Zhang? Good morning, Your Honors, and may it please the Court. Given the stage of things and what the district court decided below, appellants have to shoot the moon here. They have to establish each of several elements here, and I will walk through them. And they have to do so with particularity, as Judge Wood hinted at under Rule 9. And they have to have plausible inferences under Iqbal. This is a heavy cumulative burden here. And we know, my esteemed counsel references other capitation cases. If you hold the capitation cases that have been held up, we're looking at, for example, the NEDSA case. NEDSA cites Gray, for example, both of them in the Seventh Circuit. Not one of the capitation cases is based on a missing service. There's not even been an express or an implied recognition that the omission of a gives rise to a falsity. And there's a reason for that. But Mr. Zhang, what worries me about that, I mean, even, it seems to me not every capitation case would qualify. But if you're talking about, as I said before, an order of magnitude, you know, somebody's entitled to $2,500 capitation payment because of their placement, and somebody else in the community who's 22 years old and in fabulous health, you know, gets a $50, there is such a discrepancy. And if you're not providing any of the services that support the $2,500 capitation, then it seems to me that's overbilling. It's just a straightforward overbill. Why is that wrong? I mean, these depend very much on the facts. I'm sure you would agree with that. And there are, of course, many, many facts that have been alleged here. You have your own high burden, which is to show that somehow this isn't enough. There's always one more fact out there in the horizon. Your Honor, I think there are two reasons why that is not a plausible inference. There are two things that are happening. One, what is the nature of the payment system? And two, is a nursing facility the same thing as a SNFist program or service? And I'd like to address both of those, Your Honor. But I wasn't really worrying about whether a nursing facility was the people. The capitation follows the people. And the people in a skilled nursing facility consume a very significant amount of medical services writ large. I mean, nurses, orderlies, doctors, the whole package. And so that's why you're entitled to a higher capitation payment. This is a very old model of delivering medical services. It's essentially the HMO model. You know, we're going to pay you this much per month, and you are going to somehow make it work within that. But if you're not providing the services, then you shouldn't have that high a capitation rate. But, Your Honor, that's precisely it. I don't think the capitation rate is for service. We are not in a fee-for-service model. The capitation, by appellant's own first amended complaint, it is a complicated risk contract that is, quote, regardless of the services actually performed. Oh, I understand that. What I'm saying, though, is when you figure out what amount of money will be paid per patient preceding that dollar amount is an assessment and an estimate across the population of how much are you going to have to do. I mean, ideally, it would zero out. You don't want the government to pay and have regularly not as many services consumed. You don't want to leave a lot of money on the table for the provider of the services. You're trying to figure out across a population what needs to be provided in order to make this a financially viable arrangement. And that's exactly what HMOs do, and that's why there are these different cells, because some populations consume a great deal of medical service. You don't know if it's Mary Smith or John Doe. It doesn't make any sense to me. I mean, it's a global estimate. That's right, Your Honor. Global estimate's a good way of thinking about it. And it's interesting, even in listening to Mr. Singh's description of how these rate cells are described. They are about the patient demographic. That's what he said. And there's little input from the defendant. Right. And from there, there's not even really a description of services. We do take issue with the suggestion that a SNF program, which if you look at the SNF program, is one of several manners of care coordination, that that program or even that particular provider, we are not in a world where we're missing an entire, for example, like even a specific service. If you look at either the GenMed, kind of GenMed contract, if you look at the contract with the government, the SNF program is one of several manners of either care, primarily care coordination here. We're not in a world where you're missing, for example, entire surgeons. Right. And that makes it is already difficult to disaggregate value in a per person, per month. But what I understand the allegation to be, though, is that there is, in fact, an entire package of of services that you're that Molina has said that it's providing to people in its business method and you're thus overcharging the government. That's how I read the allegations. But for example, we don't know that everything, for example, within the alleged packet that GenMed was providing wasn't. We know, for example, that appellant concedes that several examinations, right, that were part of the SNF services that were supposed to be provided. There's actually a concession that actually those examinations were provided. Now, appellant thinks that that is a but it's not the case from the record that no care coordination was provided. That's just not true. In fact, yes, let me ask you the same question to follow up here that I asked Mr. Singh. Can you quantify how important the skilled nursing facility specialist program was in terms of the overall contract expenses and capitation rates? I don't think in this system it's easy to do that. And I actually think that the Milliman actuarial report, for example, when it talks about nursing facilities and those rate cells, it doesn't even mention SNFist as a particular provider. My problem, the problem I have is then as I understand that the complaint uses the term important, an important part of the overall capitation rate. And what it's reasonable to infer about both materiality and knowledge based on that importance is uncertain. But I would, well, if nobody can quantify it, nobody can quantify it yet. We are at the pleadings. I would think it ought to be fairly easy for Molina to show that if it did have these so-called SNFist services available, that that would be easy to prove. But your honor, even at the pleading stage, that's not our burden to prove. I mean, I do have the testimony from your chief operating officer suggesting pretty clearly that you simply were not in a position to have provided this over a two-year period. And we've got a pleading that tells us this is very important. Your honor, under the materiality cases, including Escobar, right, not every violation of an enumerated or express service rises to that level. I understand that perfectly well, Mr. Jang. That's very clear. But if that's the standard, you're tilting at a straw man there. How important is this promised service? It is not material to this fee for service contract. It just isn't. And that's because we're talking about a complex MCO here. And I think under the false... What if it's 30% of the monthly expenses on average? I, you know, I think we would see it in some government action. It's even well short of the numerous lesser enforcement remedies that could have been pled. Not a single one of the lesser remedies, right, is pled here. What if it's 10% of the capitation rate? I don't think that that would rise to a level of materiality unless we had an indication that the government had done something. Let's take the NEDSA case, for example. The NEDSA case was a Northern District of Illinois case. It also was a capitation case. And actually there, there was a little bit more hint of materiality under NEDSA. Because in NEDSA, we actually saw the government perform an audit or kind of there was some citation well short of intervening in a false claims act. And even there, the court concluded that this is not material because of the nature of the capitation payment. It is not per service. And so... It's a district court decision, correct? But I think if you hold the two or the various kind of capitation cases next to each other, here's how I think it sorts out. I want to be clear, Your Honor. We're not suggesting that under these complex capitation systems, that it is... We're talking about an immunization of these... That's not the land that we're in. We know at least two buckets of false claims that can be articulated in a capitation system. But we are not in that bucket. We're here fundamentally on a... I think Appellant is trying to cram a fee-for-service claim into a world where the capitation payment is not fee-for-service. But you do need to look at the economic reality of what you've done. I read them as largely going under the implied false certification notion that the Supreme Court has now said, overruling this court, by the way, by express citation and disapproval of our earlier law on that happens. And I think if you're certifying that you're providing a certain package of services to everybody in the covered population, but you are in fact only providing 80% of those services, then I don't see why that doesn't amount to an overcharge. It's not so different from an over-billing case. I think that gets to materiality, Your Honor. We don't have any way- It gets to everything. At first, it gets to what did you promise you were doing, and were you falsely representing that you were doing this? We don't agree that we were making a representation about all services. We actually know that from the role of the SNFIS, Your Honor. It's not the case that, again, that the SNFIS is the only provider of services in that nursing facility. And the other thing I will say- But you didn't say that anybody else was providing these kinds of services either. There was the remark that Judge Hamilton referred to a minute ago. I mean, you started out providing one package, and then it got significantly reduced. And that goes both to what are you certifying you're doing. It probably also, in a way, goes to materiality. Fine. But when you say you're doing something, but you're only doing 80% of it, in your view, that's okay? No, but, Your Honor, I'm not saying that we did only 80% of it. I guess what I'm saying is the record does not show that a SNFIS, one of several people that are admittedly part of a team of care coordination, there's no allegation, for example, that there weren't other providers of care coordinators under the very government contract. The SNFIS, this kind of focused person at the nursing facility, is one of several people listed on that team towards the end, frankly. So, there is that testimony that a program, a program that had been delegated to GenMed had not been replaced. Some of the services within that program, for example, these comprehensive exams, there's no dispute that those were provided, right? But there is some dispute about what the exams were like. I thought you were arguing, if I'm remembering, that they were not SNFIS services anyway, and they were arguing that the people who did these examinations were not qualified to serve the population in the same way that the SNFIS, I'm sorry, Judge Hamilton, and everybody's using this word. I succumb to the temptation as well. It's a quasi-word. It's not really a word. But anyway, I thought there was some debate about whether there was true substitution or whether there were just something else going on. I don't think, for example, there might be a dispute about the quality of the service that had been provided, Your Honor, but there's not a dispute that the exam didn't happen or that fundamentally there weren't licensed people. That actually leads me, Your Honor, to the second bucket of recognized cases under the capitation world. That's actually Escobar and the Martino-Fleming case. I think what we're struggling with, and I struggle with this too, is at what level do we hit materiality, right? Is it 10%, 20% or whatever? What the Martino-Fleming and the Escobar cases tell us is, sure, if you're providing primarily one thing, in both of those cases, mental health services, such that there's such a resounding, central, fundamental problem, in those cases, there was a, quote, systemic loss of licensure, right? If that were the allegation here, I think we'd be a little closer to both a falsity and a material falsity. But here, even in the description of the affirmative claims, whether it's the enrollment data or something like that, you would have to, for example, be missing something closer to the nursing facility. You just don't have a nursing facility at all. But the allegation here is much more surgical. Appellant is not claiming that we're missing fundamental nursing facilities or that people weren't getting actual health services. They were missing an important care coordinator. That is the extent of the allegation. And under even the structure of the government contract, right, we are not making affirmative statements expressed or implied about that level of service or provider. Again, even in the description of the rate cells, there's not a discussion that we are making a false claim about specific providers or specific services. But, you know, I'm looking at the complaint. I mean, the complaint alleges that, you know, kind of defines these skilled nursing services. It says that Molina had an obligation to provide them. It quotes that Molina executives, I'm looking here, this seems to be page 815, page 14, said that these particular services were required to be provided. And it says that Molina wasn't providing them. I mean, I don't know what else at the pleading stage anybody could possibly say. Your Honor, we don't dispute that they were an express term under the contracts and, you know, for two years. And for a company in the business, you know, these are not, you know, trivial aspects of the care that is expected when somebody goes to a skilled nursing facility, at least so they allege. They say this is what the skilled nursing facilities are all about. Your Honor, I think because Dr. Prose is in this kind of sniffest world, and I know we're struggling with that term, I understand why it's important to Dr. Prose. But I don't think that rises to the level. The complaint actually attaches both the government contract, where you can see the kind of relatively minor role that particular program goes to. It attaches the Milliman report, which explains that it might have taken fee-for-service data. It doesn't specifically mention, as Judge Hamilton kind of points out, when we're trying to disaggregate it, it doesn't actually say what a sniffest provider is worth under that system. But what we know is that what Milliman spit out at the end is not this kind of disaggregated amount. And so I think the kind of, you know, the well-worded complaint has to be held against the actual contracts themselves. It has to be held against the Milliman actuarial report. And those undermine the inference that this was a very, very, it was basically the only, to make it seem like it's almost the only thing that was happening at a nursing facility. And that is not suggested by any of the attached documents. So again, we go back to the burden question. And I'd like to pick up on something that Judge Wood kind of started with in the earlier section. There's kind of this catch-22 here. If this was so important, as you pointed out, Judge Wood, and it was such a material thing to the government, it's not hard to find Molina. There are allegations that Molina, you know, we're not talking about an individual service provider that did one thing and the government's not checking in on them. There is, if you read the whole of the complaint, clearly the government is re-engaging at several levels with Molina, right? Including a 2018 renewal that was after the filing of Dr. Crow's complaint with the government. No, I understand that the renewal and that you place almost conclusive weight on it. I think that's a little heavy. And what concerns me is that the whole point of the False Claims and the KTAM actions is that the government itself doesn't have the resources either to bring all of these cases or, when they're called to the government's attention, to pursue them. And if the government thinks that the relator is doing a good job, I don't think we are to take an adverse inference and say, well, this is really one that's not that important because the government isn't devoting its own resources. The government only has so many prosecutors, so many lawyers, so many resources to use. So I think that's a neutral factor. I mean, there's a statute, there's a relator. I don't think we should rest on it. I don't think that's the dispositive factor, but I'd also point out again here, there are many lesser remedies that could have been pled. Not a single one of them is alleged, not even a simple audit like a NEDSA. And so, again, in terms of the plausibility of the I don't think anything has been met here, Your Honors. Do you think materiality and scienter have to be pleaded with particularity? I think knowledge does not have to be pleaded with particularity. I think with materiality, there has to be something, there has to be some hook to it. For both of those, it is not enough to simply say the basic elements of it, right? And so we don't think that anything above the pure recitation of the legal standard has happened here. Thank you. All right. Thank you very much. Your time has expired. Mr. Singh, you had a little time left. Sure. I'd like to start just if I can be helpful in pointing up some record sites that might be you asked about compensation for Dr. Proz's company. You'll find the compensation schedule at document 53-3, page 164. And it's about what I said before, that there's a fee for service payment of $128.08 per visit, plus some additional fees if additional medical and surgical services are provided. And there's a little schedule of how those go, but it's not peanuts. It's real money. You'll find the rate cell information from the Middleman report at page 172 of the same document. So these are the exhibits to the first amended complaint. And to fill in a little more what I said earlier, so the rate cell in the greater Chicago area, for example, for someone in a nursing facility was $3,180 for people above the age of 65. The next closest rate cell is the other is much, much, much lower. But even if you're looking at the top end of it, you're talking about a disparity of at least $700. So again, real money. Mr. Young mentioned that there are that, you know, maybe this wasn't the same as cases involving lack of licensure, for example. I refer you now to complaint paragraph 114. This is where we're quoting their COO. And I'm just going to read it. He says, the SNFIS program is more in the sense of monitoring a patient as they're in these skilled nursing facilities to make sure they're not digressing in the acuity of their condition. And they are receiving the traditional medical and surgical services that they otherwise would have to go to a hospital for. And then he says, our staff did not have the ability or licensure to render those services. So I think Mr. Young's proposed distinction that this isn't like cases where they lack the qualifications is problematic on the basis of what's in the first amended complaint. Then, you know, they also say this is not a terribly important obligation. I'd refer you to pages 87 and 96 of the appendix and paragraph 39 of the first amended complaint. The appendix pages are the pages from the actual contracts. And they say quite unequivocally that Molina is going to provide a SNFIS program. Paragraph 39 of the first amended complaint is when they responded to the RFP, the request for proposal, they said, we're going to do a great job with this. We're going to have people available 24 hours a day, seven days a week. These were important obligations that they promised to provide, stop providing. And then what makes this a false claim is they kept taking all the money. You know, they had ways out of liability. They could have come clean. They could have not taken all the money. They could have worked this out with the government, but the complaint alleges they didn't. And that's what takes this case past the pleading stage. Thank you very much. All right. Thank you very much. Our thanks to both counsel. We'll take the case under advisement and the court will take a brief recess before calling the second case this morning. Court will be in recess briefly. Thank you, your honors.